Good morning, Your Honors. May it please the Court, I'm Charles Carbone on behalf of the appellant in this matter. It's perhaps easiest to start with the claims against Appellee Kelly in a discussion of the case. Obviously, Officer Kelly was the individual who opened Cells No. 224 and 232, which led to the prison melee and the attack on Appellant Glenn. The Under Farmer and Brennan, we know that for a prison official to be liable to prevent a future harm, the prisoner must essentially prove two things. The first is that he was incarcerated under conditions posing a substantial risk of serious harm, and the second prong is that the prison officials knew of and disregarded that risk. I think the first prong is probably the less contentious. I think all parties would agree that we have a situation here where clearly the inmate is incarcerated under conditions posing a substantial risk because rival high-security prisoners who are in a special segregated unit meant to keep them apart are permitted to leave their cells without any restraints. By definition — What state of mind do you need for the second prong? The second prong is the subjective standard, and I believe we have that, Your Honor, with respect to some objective — we're able to establish that by way of some objective facts. What is the state of mind you have to prove? That either the prison officials knew of — that the prison officials knew or should have known that they essentially — and knew of and disregarded the risk that — of serious harm that was posed to the inmate, Your Honor. Well, I don't think you understand my question. Is it negligence? Is it gross negligence? No, it's — Is it — I mean, what had to have been going through Officer Kelly's mind as he pushed those buttons for you to be able to establish liability? Let's say he sort of fell — I mean, this was a control panel with buttons, right? So if you wanted to open a cell door, you didn't go up there with a big key ring and pick the key and twist it in the lock, right? This was an electronic board, right? Precisely. There's essentially an electronic — Let's say he had an epileptic fit and he fell on the keyboard and started punching a bunch of buttons. That wouldn't be good enough, right? No, of course not. He — This would be involuntary action, right, this epileptic fit? Precisely. So he had to have had some state of mind in pushing those buttons that would rise to the level of deliberate indifference, that would establish deliberate indifference. And I'm asking you, what state of mind did he have to have? Is negligence enough? Let's say he was just negligent in pushing the wrong buttons. Your Honor, mere negligence is not enough to support a claim of deliberate indifference, nor is mere — How about you just tell me what state of mind it is? I believe that he would have subjectively had to have known of the risk presented to inmate Glenn by pushing that button and disregarded that particular risk. He knew the risk, obviously. We all know, you know, for the reason he stated, that's prong one. So he would have had to do it deliberately, right? Precisely. Okay. So this would have meant something like he did deliberately, thinking it would be great fun to see a melee in the prison, or he did it deliberately because he wanted to go after your client and this was a good way to punish him. For some reason he intended to let out the guards. He pushed the buttons intending to let the guards — not the guards, the — Let the inmates fight one another. Let the inmates out so they could gang up on Mr. Glenn, right? That's correct, Your Honor. Okay. Now what do you have in the record to suggest that kind of state of mind on the part of the officer? I think we have three objective facts. There's no evidence that there was any prior bad blood between Mr. Glenn and Officer Kelly, right? No, we do not have those facts in the record, Your Honor. There's no — there's nothing that Officer Kelly is quoted to have said to him like, oh, I — either personal dislike or racial animus or anything else that would suggest that some — that he — We have no statements by Officer Kelly. That he had it in for Glenn, right? We have no statements of that sort, Your Honor. Okay. So what do you have? We have, I believe, three objective facts. One, we have the visual cues. We know that Officer Kelly saw the inmates in the shower, and we know that Officer Kelly could see that the two cells that he opened were full. So there's no peniological purpose in opening cell doors to allow Glenn or the other inmates who were returning from the child hall into those cells if those cells are already filled. And we know that Officer Kelly had the visual cue to see that those cells were filled. That's right. And if he was deliberate, that would show — that would show — that would show that he disregarded your client's safety. But how does that — how does the fact that he saw them there prove deliberateness? Well, it certainly calls into question why he was opening cell doors for cells that are occupied by the maximum number of occupants for that cell. I think that's one objective fact. I indicated that there were — there were three. I think that's one objective fact. And I think once you look at the totality of the three facts and the totality of those circumstances, I think you can infer. Okay. What's the other — The second one, Your Honor, is that this individual's job, for which he's highly trained in a maximum security environment — he had been a correctional officer in two institutions, one at High Desert State Prison, a maximum security, and at Pelican Bay, a supermax. His entire job, with all due respect to him, is to sit in a booth and push buttons. Let me ask you this. I'm tempted to view this case as a fool me once, shame on me, fool me — shame on you, fool me twice, shame on me. He opened not one but two doors. Precisely, Your Honor. He's asking us to conclude that it was not deliberate indifference when he, quote, accidentally opened two different doors, one of them by — I'm not quite sure I understand his explanation. Now, obviously, the prisoner's not in a position to say, well, I watched him and I read his mind and he did it on purpose, but it seems to me at least permissible for a jury to conclude that Officer Kelly was acting with deliberate indifference or potentially worse. Now, I've got another question, though, and you start out with Kelly because I think that's probably your strongest case. What do we know, if anything, about the door where the other officers were waiting and their capacity to enter on their own without waiting for Kelly to come and let them in? Well, let me deal with your first question, Your Honor. I think you're correct. We're essentially — That wasn't a question. Well, let me just — I'm not talking about the door. Let me just echo that sentiment for just one moment and then I'll jump immediately to your question. We're essentially asked to believe — I'm not going to give you extra time to do this. If you don't answer just Fletcher's question right now, you're going to sit down without — I'll answer your question directly then, of course, Your Honor. We don't know much. We do know that at about — I believe it was 635 is when the inmates were returning from the dining hall. At that particular time, the doors were open. Perhaps at about 637, Officer Kelly hit his alarm. No, I've got a very specific question and you can say I don't know or you can say you do know. When the other officers come to the outside of the door of this Section C, they wait for a time. I'm not sure how long, but they wait for a time until Kelly comes and lets them in. That's correct. Did they have the capacity to open that door without waiting for Kelly to come? I believe — That's my question. In short answer to your question, Your Honor, I believe that's a material fact in dispute. We don't know if they had the ability or the capacity to open that door. Well, the fact that you don't know doesn't make it a material fact in dispute. You have evidence that they could have opened it from the outside. Well, the evidence is this. It makes no peniological sense to have only one officer, particularly the officer in that unit, with the capacity to open the door. Think about it from a prison standpoint. If that officer is injured for any reason, then if the appellees are correct, then no other officer would be able to get into that unit. It's illogical to have only one person be able to key into that door, especially the officer who's in that unit for obvious reasons. It's logical inference rather than, at this moment at least, positive knowledge that, yes, they can get in because somebody gave me a declaration they could get in. If I could have answered it that way, I would have. But even if you are right in that inference, it doesn't mean that the officer at the door had the second means of entry. You could say, well, it doesn't make any sense to have only the officer in there have access, but it could be that the second access is somewhere else, at the warden's office or somewhere else in the building. It doesn't get you to the point of answering Judge Fletcher's question. What is it to prove that those officers, given where they stood, had at their disposal a means of opening the second door? All you've shown is another means to open the door. All you've said is there's a good reason to believe that somebody else, somebody outside the unit, would have had a way of opening that door. There's nothing to say that that person would have been there standing at the door where the officers were, right? That is correct. The only other thing I might add is we are dealing with 13 correctional officers. It's not just one correctional officer responding to that C-section rotunda. We have 13 officers involved. I would imagine that this is the entire battalion of this segregation unit of officers responding to the melee. If not a single one of the 13 officers has a key to get into that section, I think that's highly suspect, at best, in terms of why they were standing there or the fact that not one of the 13 officers didn't have a key to enter. I think there are two other facts. You are out of time. We'll hear from the government. Thank you, Your Honors. May it please the Court. My name is Jay Russell. I'm a Deputy Attorney General for the State of California. How do you get past Judge Fletcher's Irish logic? Well, there is no evidence, Your Honor, of the state of mind of Mr. Kelly. You understand the problem, right? I do understand the problem. You have two highly dangerous... It's one thing to say, okay, a plane comes down, something happens, it's an accident, he falls down, he hits the wrong button. But two in a row, within minutes or seconds, it was a very short time, he punches two buttons and lets two sets of dangerous criminals out. It's a little... It's beyond suspicious, isn't it? Well, what we have, Your Honor, is the declaration of Officer Kelly, who states that in the first instance, he made a mistake in opening up the cell door. He saw an inmate pause in front of cell 224, and when he saw that inmate paused, he mistakenly opened up that cell door. In the ensuing melee, he inadvertently opened up a second cell door, cell 232. And so what we have is we have a declaration from the officer saying this was a mistake... But let's say, for whatever reason, Officer Kelly headed in for Mr. Glenn, and so what he decided to do is let him in there and then open up a couple of doors and let these guys beat up on him. Let's say, for whatever reason, he had that. Isn't that exactly what he'd say? He'd say, well, the way I'm going to get away with it is by claiming that, oh, one was an accident, another one was a different kind of accident. That may be true, Your Honor. Doesn't the proximity of two accidents like that on a matter that's highly... I mean, this is what the man does. This is what he does for a living. And he knows that it's very dangerous to push the wrong button. Your Honor... Twice? We have his... Within minutes? Well, we have his declaration saying that it was a mistake and inadvertence. There are other ways of proving the inference that the Court is implying here. If there were other similar incidents, if there were instances in which this officer had said, well, I want to get these guys. What we have here, it looks like, is the instance that the Court talked about in the case of Jeffress v. Gomez, where we have constitutional... We have a situation that occurred that could be a constitutional violation, and it depends upon the motive. And I think what the Court, in that instance, talked about was either motive Z or Y. And if it were one motive, it would be not a constitutional violation. And if it were the other motive, it would certainly be a constitutional violation. And what we have here, the only evidence that we have in this case is Officer Kelly saying, I made an egregious mistake. There's no dispute about that. What we're talking about is... Well, there's a fundamental dispute about that, and the question is whether it's a mistake. That's correct, Your Honor, but there's no countervailing evidence apart from what... But my point is, I think it may be possible for a jury to look at this and say this is so improbable that the jury would be within its proper scope to conclude that they don't believe it. Now, I'm not saying I do or I don't. I'm saying I think it may be possible for a jury, permissibly, not to believe it. I think what needs to be looked at is the ensuing behavior as well, Your Honor. I mean, after having done this, Officer Kelly, as well as Officer Schellabarger and Officer Berndt, talk about the substantial efforts they undertook to quell the disturbance. Again, if we're going to be talking about inferences, I think a different inference could be drawn if these two cell doors were opened up and nothing immediately happened. But the evidence that we do have shows that there was immediate actions to try to quell the disturbance once the mistake was made. So in that regard, Your Honor... How long were the officers waiting at the outside door? And do you know what means they might have had to get in that door without waiting for Kelly to come to the door? Well, Your Honor, there is a penological interest to having that door closed. It's not... I understand that. I had two different questions and neither of which that's an answer to. Okay. It's not in the record as to how long they waited. And your second question was? It was about what means did they have other than waiting for Kelly to come to get in that door. Well, again, what we have in our record is Officer Schellabarger saying that once the answering officers came into what's called the rotunda area, a supervisor, Sergeant Samara, did order Officer Kelly to open what's called the section door. That's the section in the area in which this fight was taking place. And Kelly didn't open the door until ordered to do so? That's correct, Your Honor. Did it only in response to the order? That's correct, Your Honor. Why didn't he do it before? Well, it's not in the record. I do know that at this time, in 2000, that the procedures for the security, excuse me, not the Security Housing Unit, the Administrative Segregation Unit, provided that if an incident is occurring, that door is not to be opened unless it is ordered opened by a supervisor, such as Sergeant Samara. I mean, we do have evidence in this record that Officer Kelly immediately opened a door once he was ordered to do so by Sergeant Samara. That's in Officer Schellabarger's declaration. However, there's nothing in the record that shows that that, in fact, was the procedure. How much discovery have we had? I don't believe that there was any, Your Honor. In other words, there may be a fair amount of evidence available to Mr. Glynn now counseled through depositions to find out a fair number of facts? I mean, what we have is evidence put in by your side. That's correct. That's correct. Keeping in mind that in the order of service, Mr. Glynn was advised of the provisions of Rand v. Roland, where he did have an obligation to obtain this kind of evidence. There was no stay on discovery. There were no stays on the proceedings. The plaintiff did have means of investigating this. At what point does Mr. Glynn become represented? Now, the other side may have to answer this. You may or may not know. I believe about three months ago. And at what point did he get represented in relation to when this suit was filed, when we got a summary judgment from the district court and so on? It wasn't until after the proceedings were here in the Ninth Circuit Court of Appeals. During this entire period when he could have gotten discovery on your view, he was unrepresented? That is correct. Okay. What could he have done from prison to get discovery? Could he have asked to conduct a deposition of Mr. Kelly? Yes, Your Honor. He could have done that. He could have asked written discovery. He was free to ask interrogatories. He was free to ask requests for production of documents. There are many, many cases in which unrepresented prisoners do ask very detailed requests for production of documents of the officer's personnel files. I asked you whether he could take a deposition of Officer Kelly and you said yes? No, no. He was free to do so. He did not. He could have done it. He could have done that. But he did not serve a notice of deposition. Nor did he serve written deposition questions. Nor did he serve interrogatories or requests for production of documents. In short, Your Honors, the evidence that's before this Court is Officer Kelly's declaration saying, I made a mistake and I inadvertently Who mistakes? Well, he mistakenly opened up the first cell door. That's clear from his declaration. When he saw the inmate pause in front of the cell, he mistakenly opened it up believing that that inmate I believe it was Mr. Valenciana could enter into that cell or should enter into that cell. When that door was mistakenly opened before he was able to close it, two inmates did come out and start running down the tier. There is no evidence that Officer Kelly was able to see into that cell to determine whether or not the cell was occupied. The bare facts in this case are that Officer Kelly in that instance made a mistake. And when he was trying to open that cell, he further declared that he inadvertently and does not recall having opened a second cell door that's cell 232. So, what we have I think the state of the evidence under Mr. Kelly's declaration is not this didn't happen while he was trying to quell the disturbance. I'm just reading from what he says. It's a little vague, but this is the best I can do because it's what he says. Later, I learned that cell 232 was opened. I'm reading from paragraph 12. It appears that when I put inmates Hunziker into a cell, I had my right hand on the close button to cell 132. I inadvertently opened cell 224 with my left hand and must have leaned forward with my right hand and opened cell 232. Is he related to Rosemary Woods? Well, Your Honor, I'm also referring to the exhibit that was attached to Officer Kelly's declaration. And that's within the record at, I believe, Courts Docket 22, and it's page 0099. And he was asked by an officer who had responded to this incident, why was cell 232 open? I told her, I don't know why I had opened it. The only explanation I can think of is that I pressed this button while I was pressing another button. So, it's inadvertence. He inadvertently opened up that second door. So, what we have before us is we have mistake and we have inadvertence and we know from both Farmer as well as Estelle that neither of those  constitutional violation. Thank you. Thank you, Your Honors.
judges: Kozinski, W.fletcher, Holland